# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CAREY ALFRED, *et al.*, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-2904 |
| | § | |
| SPECIAL AGENT EDMUND | § | |
| COLLINS, *et al.*, | § | |
|     Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the Court is a Motion for Summary Judgment filed by Defendant M.

Patrick Condon [Doc. # 109] ("Officer Condon's Motion") and a Motion for Summary

Judgment filed by Defendants Daniel Comeaux and Edmund Collins [Doc. # 110] ("DEA

Defendants' Motion").  Plaintiffs Carey Alfred and Tammy Alfred, individually and on

behalf of their minor children, Candace Alfred, Cayla Alfred, and Carey Alfred (collectively,

"Plaintiffs"), have responded.[1]  Also pending before the Court is the United States of

America's Motion to Dismiss State Law Claims [Doc. # 113] ("Motion to Dismiss").[2]

---

[1]     Plaintiffs' Reply to Defendants' Motions for Summary Judgment [Doc. # 123] ("Response").
Also filed are the DEA Defendants' Reply [Doc. # 126] and Officer Condon's Reply [Doc.
# 127].

[2]     Plaintiffs have not responded in opposition to the United States' Motion to Dismiss.

Having considered the parties' submissions, all matters of record, and the applicable legal authorities, the Court concludes that the DEA Defendants' Motion, Officer Condon's Motion, and the Motion to Dismiss should be **granted**.[3]

## I.   <u>BACKGROUND</u>

The undisputed evidence in the record establishes the following facts.  On July 26, 2001, the United States Drug Enforcement Administration's ("DEA's") Mobile Enforcement Team ("MET") was investigating narcotics activity in Humble, Texas.  The DEA Defendants (Special Agents Daniel Comeaux and Edmund Collins) were part of the MET.  Other members of the MET were DEA Agents Dwain Coker and Curtis Wehrman.  Agent Namon Jones was the supervisor in charge of the MET, but he was off duty the night of July 26.  Agent Collins, as the senior DEA agent, acted as supervisor in Agent Jones' absence.[4]

The specific purpose of the MET was to investigate suspected purchases of crack cocaine at a residence on Dunbar Street.  If it appeared that persons purchased drugs from this location, the MET agents asked local law enforcement to carry out a traffic stop to investigate the suspects.[5]  On July 26, 2001, prior to the events at issue in this case,

---

[3]    Plaintiffs sued seven Defendants originally.  All Defendants have been dismissed except the DEA Defendants, Officer Condon, and the United States of America.

[4]    Deposition of Agent Coker, Exhibit M to Response, at 19–21.

[5]    DEA's Office of Professional Responsibility's Investigation Report ("DEA Investigation Report"), Exhibit A to DEA Defendants' Motion, at Bates 236–37, 292.

numerous vehicles driven by both African-Americans and non-African-Americans leaving the Dunbar Street location had been stopped for investigative purposes.[6]

On the evening of July 26, 2001, Plaintiffs Carey and Tammy Alfred took their three children, Candace, Cayla, and Carey, and two nephews, minors Corey Phillips and Malik Norris, to the movies and dinner.   Plaintiffs and their children are African-American. Afterwards, at approximately 9:30 p.m., Plaintiffs pulled their black Chevrolet Tahoe into the parking lot of a K-Mart store on F.M. Road 1960 near Dunbar Street.[7]   Plaintiffs had designated the parking lot as a meeting place to return Phillips and Norris to their mothers. Unbeknownst to Plaintiffs, the MET was using the parking lot as a staging area to respond to activity observed at the alleged crack house on nearby Dunbar Street.[8]   After the activities described below transpired, Agent Comeaux requested that the Houston Police Department ("HPD") conduct an "information stop" on Plaintiffs' Tahoe after it left the K-Mart parking lot.[9]   Agent Collins was with Agent Comeaux in an official government vehicle at that time.[10] Agent Comeaux and Agent Collins are both African-American males.[11]

---

[6]        *Id.*, at Bates 236.

[7]        *Id.*, at Bates 125.

[8]        *Id.*, at Bates 183.

[9]        *Id.*, at Bates 238.

[10]       Deposition of Agent Collins, Exhibit E to DEA Defendants' Motion, at 12–13.

[11]       Affidavit of Agent Comeaux ("Comeaux Affidavit"), Exhibit C to DEA Defendants' Motion, ¶ 3; Affidavit of Agent Collins ("Collins Affidavit"), Exhibit D to DEA Defendants' Motion, ¶ 2.

Agent Coker observed a Lexus pull into the parking lot in an open area away from the K-Mart store.  Shortly thereafter, Plaintiffs' Tahoe pulled up and parked near the Lexus.  Agent Coker moved his vehicle to monitor the Tahoe and Lexus without being detected.[12]

From his unmarked government vehicle in a different location in the parking lot, Agent Wehrman also observed the Lexus and the Tahoe.  He saw the Tahoe pull up a couple parking spaces away from the Lexus.  A woman then walked from the Lexus to the Tahoe and opened its back door.[13]  The Lexus was driven by Jennifer Norris.  Although not known by or apparent to the agents doing surveillance, Ms. Norris was there to retrieve her child, Malik Norris.  After Ms. Norris returned to the Lexus with her child, she drove out of the parking lot.  The Tahoe then re-parked two spaces away from its original position.[14]

Believing they may have just witnessed a drug transaction, Agents Coker and Wehrman each radioed the DEA Defendants a report of what they had seen.[15]  The DEA Defendants pulled into the parking lot shortly after receiving the reports.  Agent Comeaux saw the driver of the Tahoe (Mr. Alfred) talking on a cellular telephone.[16]

---

[12]     DEA Investigation Report, at Bates 125.

[13]     *Id.*, at Bates 63–64, 68.

[14]     *Id.*, at Bates 68.

[15]     *Id.*, at Bates 137; Deposition of Agent Wehrman, Exhibit H to DEA Defendants' Motion, at 8.

[16]     DEA Investigation Report, at Bates 237.

Shortly after the Lexus left the parking lot, a green Honda Accord arrived and pulled up near the Tahoe.[17]    Alisha Irving was driving the Honda.    The MET agents saw the occupants of these vehicles have a brief meeting similar to the earlier encounter the agents had observed between occupants in the Tahoe and the Lexus.    Agent Coker was able to see from his vantage point the feet and head of a person walk from one vehicle to the other.[18] From a different vehicle, Agent Wehrman witnessed the Honda pull up near the Tahoe, approximately five parking spaces away.    He saw a passenger exit one vehicle and approach the other.[19]    Neither MET agent reported seeing any children.    After this meeting was over, the Tahoe and Honda left the parking lot in tandem.[20]    In fact, unbeknownst to the DEA Defendants or anyone doing surveillance, Ms. Irving had come to retrieve her child, Corey Phillips, from Plaintiffs.

The K-Mart parking lot was known to the DEA Defendants as a rendezvous point for illegal drug dealing activity.[21]    In May and June 2001, within 60 days of July 26, Agent

---

[17]    Written Statement of Carey Alfred, Exhibit 1B to Officer Condon's Motion, at 1.

[18]    DEA Investigation Report, at Bates 134–35.

[19]    *Id.*, at Bates 73.

[20]    *Id.*

[21]    Affidavit of Agent Coker, Exhibit F to DEA Defendants' Motion, ¶ 5; Affidavit of Agent Wehrman, Exhibit G to DEA Defendants' Motion, ¶ 4.

Comeaux made three undercover purchases of cocaine there and was propositioned by a person seeking to purchase cocaine.[22]

The Tahoe and Honda parted ways at an intersection.  Agent Wehrman followed the Honda.  Agent Coker (in one car) and the DEA Defendants (together in another car) followed Plaintiffs.[23]  Agent Comeaux had seen an African-American driver in the Tahoe.[24]  Agent Collins did not know at that time that Plaintiffs were African-American until after HPD effectuated the traffic stop.[25]

Thinking the agents had witnessed two drug sales by the occupants in the Tahoe, Agent Comeaux decided to investigate further.  He requested by radio that uniformed HPD officers conduct an "information stop" on the Tahoe.[26]  According to Agent Comeaux, an information stop involves stopping a citizen, requesting identification, and assessing whether the citizen is nervous.  If a citizen acts nervous, officers will typically investigate further by requesting permission to search the vehicle or using a dog trained to detect narcotics.[27]

Defendant M. Patrick Condon, a Caucasian, is a police officer with the HPD.  On the night of July 26, 2001, he was on patrol with his partner B.C. Williams in the vicinity of the

---

[22]     Comeaux Affidavit, ¶ 2.

[23]     DEA Investigation Report, at Bates 127.

[24]     Deposition of Agent Comeaux, Exhibit E to Response, at 18.

[25]     DEA Investigation Report, at Bates 158, 183.

[26]     *Id.*, at Bates 283.

[27]     *Id.*; *see also* Deposition of Officer Condon ("Condon Depo."), Exhibit E to Officer Condon's Motion, at 8.

MET operation.  Officer Condon received the radio call from Agent Comeaux and was told to stop a black Tahoe with a partial license plate number "3XDM."  Agent Comeaux did not request a "felony stop".[28]  Instead he informed HPD that he suspected the occupants of the Tahoe were involved in the sale of crack cocaine.[29]

Officers Condon and Williams (collectively, the "HPD Officers") observed the Tahoe traveling at a speed greater than the flow of traffic.  They also witnessed the Tahoe make several lane changes without signaling.[30]  The HPD Officers then stopped the Tahoe, using felony stop techniques.  Mr. Alfred, who was driving, pulled over and stopped the vehicle.  Officer Condon gave commands over a loudspeaker attached to his patrol car.  He ordered Mr. Alfred to roll down his window, place his hand outside the window, and indicate with a finger gesture how many people were inside the vehicle.  The HPD Officers were unable to determine the number of passengers because it was dark and the Tahoe had tinted windows.  Officer Condon then instructed Mr. Alfred to open the door from the inside, exit the vehicle with his back to the Officers, walk backwards with his hands in the air, and to go down to his knees with his face down.[31]

---

[28]     A "felony stop" is where a vehicle is stopped by officers who draw their weapons, order the occupants out of the vehicle, handcuff them, and place them in the back of police cars.

[29]     Affidavit of Officer Condon ("Condon Affidavit"), Exhibit C to Officer Condon's Motion, at 2.

[30]     *Id*.

[31]     *Id.*, at 2–3.

When he exited the car, Mr. Alfred turned and informed Officer Condon that his wife was a police officer.  Mr. Alfred stated that an unidentified officer responded, "Turn around. I don't give a damn if she's Lee Brown"[32] or "I don't give a f- - - if she's Lee Brown,[33] turn around and put your hands up."[34]  Mr. Alfred then turned around and walked backwards towards the Officers.  While he was walking backwards, Mr. Alfred heard an unidentified police officer state, "Nigger, get your black ass down on your knees."[35]  Four to five guns were trained on Mr. Alfred.[36]  HPD officer Bridget Lummus handcuffed Mr. Alfred and placed him in the back of Officer Condon's police car.  Officer Condon next instructed Mrs. Alfred to exit the vehicle.  Humble police officer T.A. Mungia handcuffed Mrs. Alfred and placed her in the back of another police car.  The children remained in the Tahoe.[37]

As the officers secured Plaintiffs separately in the rear of each of two patrol vehicles, HPD Sergeant Francisco Ortiz arrived on the scene.  Sergeant Ortiz was the ranking HPD officer on the scene.[38]  At some point after being placed in the rear of the police car, Mr. Alfred overheard a male voice on the HPD radio inquire, "Is the suspect secure?"  Officer

---

[32]   Deposition of Carey Alfred, Exhibit Q to Response, at 35.

[33]   Lee Brown, an African-American, was serving as the Mayor of Houston at the time.

[34]   Affidavit of Carey Alfred ("Carey Alfred Affidavit), Exhibit 1P to Officer Condon's Motion, at 1.

[35]   *Id.*

[36]   Condon Depo., Exhibit P to Response, at 19.

[37]   Condon Affidavit, at 4–5.

[38]   Deposition of Sergeant Ortiz, Exhibit H to Officer Condon's Motion, at 20.

Lummus responded, "That's clear, everyone is secure.  There is one female officer and three little kids here."[39]  Mr. Alfred then heard the male voice on the radio reply, "If everything is secured, unhandcuff them, tell them something and let them go."[40]  Officer Lummus conveyed that message to the other officers on the scene.  Officer Condon responded, "Hell no.  You tell him to get his ass out here and tell them."[41]  Mrs. Alfred then was released. Mrs. Alfred demanded Mr. Alfred's release.  Sergeant Ortiz opened the door for Mr. Alfred and removed the handcuffs.[42]  The DEA Defendants watched these events from a parking lot across the street and arrived at the scene soon after Sergeant Ortiz called them.[43]

After his release, Mr. Alfred complained to Sergeant Ortiz about the HPD officers' comments.  Mr. Alfred was unable to identify the officer who made the racial slur.  Sergeant Ortiz advised Plaintiffs that they could file a complaint.  Mr. Alfred states that Agent Comeaux approached him laughing and said, "we made a mistake."  Agent Comeaux explained that the DEA thought that the Tahoe was involved in a narcotics transactions in the K-Mart parking lot.[44]  Mr. Alfred requested the DEA Defendants' names and badge

---

[39]     Carey Alfred Affidavit, at 2.

[40]     *Id.*

[41]     *Id.*

[42]     *Id.*

[43]     It is unclear when Sergeant Ortiz called the DEA Defendants.

[44]     Carey Alfred Affidavit, at 2.

numbers.  He also demanded to speak with the DEA Defendants' supervisors.  The DEA Defendants refused to give this information.

The Alfreds were very upset about this incident.  Mr. Alfred admits that it was the angriest he had ever been in his life and that he used profanity towards the DEA Defendants. Shortly before Plaintiffs left the scene, Officer Lummus and Sergeant Ortiz retrieved an open container of beer from the Tahoe.  Mr. Alfred was not cited for having an open container of alcohol in his vehicle nor was he cited for any traffic violation.[45]

Two months later, on September 24, 2001, Mrs. Alfred exited her home with her daughters to take them to school.  Mr. Alfred and Carey, his son, were inside the home. After placing the children in the car, Mrs. Alfred proceeded to the garage to retrieve her duty weapon from another vehicle.  After Mrs. Alfred concealed the weapon in her jacket, a male approached Mrs. Alfred from behind, placed his hand over her mouth, and threatened to kill her if she said anything.  She also saw a second male run towards her house.  Mrs. Alfred complied until she heard gunfire emanate from an unknown location.  She then engaged in a struggle with the assailant, ultimately shooting him several times and firing several rounds at the second assailant.  Both assailants ran off into the nearby woods; the male Mrs. Alfred shot was later found dead in the woods.  Mrs. Alfred's gunshots missed the second male. The second assailant and a third person, the driver, were later caught and convicted in the state system.  The Alfreds were not physically harmed.

---

[45]      Condon Affidavit, at 6.

Plaintiffs' neighbors heard the gunfire and dialed 9-1-1.  Multiple law enforcement agencies responded, including the Harris County Sheriff's Department, the Harris County Medical Examiner's Office, and the HPD.  After securing the scene, HPD Lieutenant Williams Ricks decided to call in drug detecting dogs because he suspected drugs may have motivated the invasion.  According to Lieutenant Ricks, large amounts of drugs and cash are often targeted in home invasions.[46]  Mr. The officers did not find large amounts of drugs or cash.[47]  They did find a small amount of narcotics during the search.[48]

Plaintiffs assert that Agent Comeaux was somehow involved in a conspiracy to have the attackers kill Plaintiffs.  During discovery in this case, Plaintiffs deposed the two men who invaded Plaintiffs' home in an effort to prove the alleged conspiracy.  Each of these men, Donnell Berry and Milton Kelly, testified that he has never had any dealings whatsoever with any DEA agents and that he did not know Agent Comeaux or Agent Collins.[49]  Agent Comeaux and Agent Collins similarly swore that they never used Berry or Kelly in any way, and had not used any other confidential sources in connection with the Alfreds.[50]

---

[46]     Deposition of Lieutenant Ricks, Exhibit D to Response, at 16.

[47]     *Id.*

[48]     *Id.*, at 25–26.

[49]     Deposition of Donnell Berry, Exhibit K to DEA Defendants' Motion, at 25–26; Deposition of Milton Kelly, Exhibit L to DEA Defendants' Motion, at 35–36.

[50]     Comeaux Affidavit, ¶ 6; Collins Affidavit, ¶ 5.

In addition to alleging in their complaint that Agent Comeaux was involved with the September 24 events, Plaintiffs also allege that on at least two occasions thereafter Agent Comeaux "shadowed" Mr. Alfred at his son's school.[51] There is no dispute, however, that, at that time, Agent Comeaux's son and Plaintiffs' son both attended the same school, Reece Academy.[52]

Plaintiffs also allege that in July 2003, Agent Comeaux told a co-worker of Tammy Alfred that Plaintiffs were drug dealers.[53]

## II.   DISCUSSION

### A.   Identification of Disputed Claims Requiring Decision

Officer Condon and the DEA Defendants (collectively, the "Individual Defendants") have moved for summary judgment dismissing all of Plaintiffs' claims.  In their Response, Plaintiffs have abandoned certain claims and did not defend other claims.  The Court therefore first explains which claims remain in dispute.

In the Third Amended Complaint, Plaintiffs allege various causes of actions against the Individual Defendants collectively.  These claims largely focus on the July 26, 2001 events.  First, Plaintiffs allege the Individual Defendants' acts constituted an unlawful seizure and detention.  Second, Plaintiffs allege the Individual Defendants, by force, intimidation, and threat, deprived Plaintiffs of due process and equal protection under the laws.  Third,

---

[51]     Third Amended Complaint, ¶ 24.

[52]     Comeaux Affidavit, ¶ 7.

[53]     Third Amended Complaint, ¶ 25.

Plaintiffs allege state law tort law claims of false imprisonment, wrongful detention, false arrest, and intentional infliction of emotional distress.   Fourth, Plaintiffs allege Agent Comeaux conspired with other unidentified officers "after September 2001" to infringe Plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3).[54]

In their Response to the Motions, Plaintiffs expressly abandon any claim for excessive force and all of their state law tort law claims against the Individual Defendants.[55]  Plaintiffs do not argue, or in any way address in their Response, Defendants' Motions seeking dismissal of the due process and equal protection theories.[56]  These claims are deemed abandoned and are dismissed.

---

[54]     Third Amended Complaint, ¶ 26.

[55]     Response, at 2.

[56]     Also, on the merits, Plaintiffs fail to satisfy their summary judgment burden on their due process and equal protection claim.  Plaintiffs classify this claim as a "race claim"  *See* Response, at 2 n.1.  Plaintiffs do not defend the "race claim" in their Response, but they do suggest generally that Officer Condon directed a racial slur towards Mr. Alfred.  This claim fails on the available record, however, because Plaintiffs present no evidence that it was Officer Condon who made the alleged racial slur.  Mr. Alfred states, and the Court accepts as true for summary judgment purposes, that a HPD officer on the scene said, "Nigger, get your black ass down on your knees."  Carey Alfred Affidavit, at 1.  Mr. Alfred testified that he told Sergeant Ortiz that it was the officer who handcuffed him who made the racial slur.  Deposition of Carey Alfred, Exhibit B to Condon's Motion, at 46.  Mr. Alfred had to ask Sergeant Ortiz if the officers who handcuffed him were Caucasian.  Mr. Alfred had his back turned and could not identify the officer who stated the racial slur.  *See id.*  Beside this dearth of evidence from Mr. Alfred, his race claim theory is clearly belied by other evidence in the record.  The videotape of the arrest establishes that Officer Condon did not make this racial slur.  The tape shows that Officer Condon remained in his vehicle until after Mr. Alfred was handcuffed and was about to be placed in his patrol car.  *See* Humble Police Department Videotape, Exhibit 1A to Officer Condon's Motion.  Officer Condon denies making any racial slurs.  Condon Affidavit, at 4.  There is no other evidence that Officer Condon uttered any racial slur or possessed racial animus towards African-Americans.

Pursuant to an unopposed motion, the Court substituted the United States as the defendant on Plaintiffs' state law claims in place of the DEA Defendants.[57]   In a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the United States contends the Court lacks subject matter jurisdiction over Plaintiffs' state law claims because Plaintiffs failed to exhaust administrative remedies as required by the Federal Tort Claims Act, *see* 28 U.S.C. § 2675, and the time to do so has expired.  *See* 28 U.S.C. § 2401(b).  Dismissal of the state law claims against the United States is warranted.  First, Plaintiffs abandoned all of their state law claims against the DEA Defendants.  Because the United States is now the sole Defendant in the case on the state law claims originally asserted against the DEA Defendants, the Court construes Plaintiffs' stipulation as an abandonment of all state law claims against the United States.  Alternatively, dismissal is appropriate because Plaintiffs did not respond in opposition to the Motion to Dismiss, and the time to do so under the Local Rules of this District has long expired.  *See* S.D. TEX. R. 7.3.  Plaintiffs' failure to respond is taken as a representation of no opposition.  *See* S.D. TEX. R. 7.4.  Accordingly, Plaintiffs' state law tort claims against the United States are dismissed.

Thus, the remaining claims in dispute are (i) Plaintiffs' unlawful seizure and detention claim against the Individual Defendants and (ii) Plaintiffs' conspiracy claim against Agent Comeaux pursuant to § 1985(3).

---

[57]     Order dated December 5, 2005 [Doc. # 117].

### B.    Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  However, factual controversies are resolved in favor of the nonmovant "only when there is an actual

controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir. 1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.*[58] If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Brenoettsky,* 158 F.3d at 911); *see also Quorum Health Res., LLC v. Maverick County Hosp. Dist.,* 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531,

---

[58] "When a party moves for summary judgment, . . . '[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.'" *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 (5th Cir. 2000) (citing *Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir.1993)). "[B]efore the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial." *Id.* (internal quotations and citations omitted).

545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence (quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994))).  Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.*  In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

C.    **Analysis of Unlawful Seizure and Detention Claims**

Plaintiffs assert claims of unlawful seizure and detention in violation of the Fourth Amendment to the United States constitution in connection with the July 26 traffic stop by the Individual Defendants.  Each of the Individual Defendants contends that, because he is

entitled to qualified immunity, summary judgment is appropriate on all the Fourth Amendment claims.  The Court agrees for the reasons discussed below.

### 1.    § 1983 and *Bivens* Claims

Plaintiffs sue HPD Officer Condon under 42 U.S.C. § 1983 for violations of their Fourth Amendment right to be free of unreasonable seizures.  "Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  It is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere."  *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999) (internal citations omitted).  "'Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983.'"  *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (quoting *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).  A claim for unlawful seizure and detention is a constitutional claim based on the Fourth Amendment's prohibition against unlawful detention and arrest.  "To state a claim under § 1983, plaintiffs must allege two elements:  first, that they were deprived of a right or interest secured by the Constitution and laws of the United States, and second, that the deprivation occurred under color of state law."  *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)).

The DEA Defendants are federal, not state actors.  Accordingly, Plaintiffs' Fourth Amendment claim against the DEA Defendants is brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  A *Bivens* action is analogous to an action under § 1983, the only difference being that *Bivens* applies to constitutional violations by federal,

rather than state officials.  *See Inez v. Catalina*, 382 F.3d 566, 570 n.3 (5th Cir. 2004); *Abate v. Southern Pac. Transp. Co.*, 993 F.2d 107, 110 n.14 (5th Cir. 1993).

### 2.    Legal Standards for Unlawful Seizure and Detention Claims

The Fourth Amendment prohibits unreasonable searches and seizures, *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *see United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003); *United States v. Jones*, 234 F.3d 234, 239-40 (5th Cir. 2000).   Stopping a motor vehicle and detaining its occupants, even for a moment, is a seizure for Fourth Amendment purposes. *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Grant*, 349 F.3d at 196.

Searches and seizures of motorists who are merely suspected of criminal activity are to be analyzed under the framework established in *Terry v. Ohio*, 392 U.S. 19 (1968).  Such seizures violate the Fourth Amendment only if they are unreasonable.  *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996).  The Fifth Circuit "has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as *Terry* stops." *Brigham*, 382 F.3d at 506; *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (directing that "the usual traffic stop is more analogous to a so-called 'Terry stop' than to a formal arrest").  Under *Terry*, investigative stops or detentions are justifiable if there is a "reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United*

*States v. Chavez,* 281 F.3d 479, 485 (5th Cir. 2002); *see also Terry*, 392 U.S. at 21.[59]

"Reasonableness, in turn, is measured in objective terms by examining the totality of the

circumstances." *Robinette*, 519 U.S. at 39. To meet the reasonable suspicion standard, there

must be *individualized* suspicion of wrongdoing by the person being stopped. *See Edmond*,

531 U.S. at 37; *Chandler v. Miller,* 520 U.S. 305, 308 (1997).

To justify an information stop, the officer "must demonstrate a 'minimal level of

objective justification for the officer's actions, measured in light of the totality of the

circumstances.'" *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993) (quoting *United*

*States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)). When considered together, several

otherwise innocent activities may "amount to reasonable suspicion." *United States v.*

*Sokolow*, 490 U.S. 1, 9 (1989); *United States v. Chavez-Villarreal*, 3 F.3d 124, 126–27 (5th

Cir. 1993) ("[w]e assess the basis for a stop not by isolating any component factor, each of

which may indicate wholly innocent behavior standing alone, but by examining the entire

picture, which must yield articulable and objective manifestations of particularized

suspicion"). A court may consider the investigating agents' law enforcement experience,

particularly with reference to the specific type of crime involved in the case before the court.

*See, e.g., United States v. Gonzales*, 79 F.3d 413, 422 (5th Cir. 1996). The analysis of data

relevant to the existence of a reasonable suspicion which justifies a stop "does not deal with

---

[59]    An officer "must be able to point to *specific* and *articulable* facts which, taken together with
rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at
21 (emphasis added).

hard certainties, but with probabilities," and the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981). To justify an investigatory stop, the officer must have something more than a "hunch," but need not have suspicion rising to the level of probable cause. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).

In evaluating the reasonableness of a traffic stop, the Supreme Court mandates a two-step inquiry in determining whether the stop complied with the Fourth Amendment boundaries under *Terry*: (1) whether the stop was justified at its inception; and (2) whether the Fourth Amendment intrusion was reasonably related in scope to the circumstances that justified the interference in the first place. *Sharpe*, 470 U.S. at 682. Moreover, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001); *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999).

### 3. Defendants' Qualified Immunity Defenses

#### (a) Legal Framework

Officials sued in their individual capacities are protected by qualified immunity unless the act violates a constitutional right clearly established at the time. *Brossueau v. Haugen*, 543 U.S. 194, 198 (2004); *Linbrugger v. Abercia*, 363 F.3d 537, 540 (5th Cir. 2004). The

Supreme Court has characterized the doctrine as protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

The United States Supreme Court explained, in *Saucier v. Katz*, 533 U.S. 194 (2001), the approach courts must take in assessing qualified immunity defenses. Courts must conduct a bifurcated analysis. *E.g., id.* at 200–01; *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003) (citations omitted). "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier*, 533 U.S. at 200. "A court required to rule upon the qualified immunity issue must consider this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id.* (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)); *see Hope v. Pelzer*, 536 U.S. 730, 736–37 (2002); *Williams*, 352 F.3d at 1002 (citing *Roe v. Texas Dep't of Protective and Regulatory Serv.*, 299 F.3d 395, 408–09 (5th Cir. 2002)).[60] The procedure for this first step at the summary judgment stage (as opposed to the motion to dismiss stage[61]) has been clarified by the Fifth Circuit: "First,

---

[60]     The Supreme Court explained the reason for this procedure: "In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Saucier*, 533 U.S. at 201.

[61]     There is an implicit divergence of authority in this Circuit about the procedure for assessing
(continued...)

we must determine whether the facts, either as the plaintiff alleges or as proved without dispute, establish that the officer violated a clearly established constitutional right." *Linbrugger*, 363 F.3d at 540 (citing *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001); *see also Saucier*, 533 U.S. at 201. "If no constitutional right has been violated, the inquiry ends and the defendants are entitled to qualified immunity." *Linbrugger*, 363 F.3d at 540.

 "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201; *see Linbrugger*, 363 F.3d at 540 (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001)). The Court must undertake this latter inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. As stated by the Fifth Circuit in *Williams*, "if a constitutional violation is found to have occurred, the court must determine whether the defendant's actions violated 'clearly established statutory or constitutional rights of which a reasonable person

---

61    (...continued)

the first prong of a qualified immunity defense in response to a summary judgment motion. Many appellate panels state that the issue is whether the plaintiff has "alleged" facts establishing a constitutional violation, thus suggesting that the district court should not consider uncontroverted evidence presented by a defendant in the summary judgment motion. The *Linbrugger* case is the only case the Court can locate in which the issue is addressed. It is possible that the terminology focusing on what the plaintiff "alleges" stems from the early practice that qualified immunity would be addressed on motions to dismiss. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier*, 533 U.S. at 200 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Courts are to make the qualified immunity analysis "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.* Nevertheless, as a practical matter, defendants often, in an effort to develop the facts in the hopes of obtaining favorable rulings on the second qualified immunity prong, willingly engage in discovery and then seek qualified immunity rulings through summary judgment motions.

would have known.'" 352 F.3d at 1002 (quoting *Hope*, 536 U.S. at 739).  The *Hope* Court explained the standard for a constitutional right to be clearly established: "Its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'"  *Id*. at 1002–03 (quoting *Hope*, 536 U.S. at 739)).[62]  The inquiry into whether a defendant's "actions were objectively reasonable" overlaps significantly, if not completely, with the inquiry of whether the law was "clearly established at the time of the disputed action."  *See Williams*, 352 F.3d at 1002 (citing *Hope*, 536 U.S. at 739) & n.12 ("The district court . . . unnecessarily decoupled the clearly established/objective unreasonableness test of the Supreme Court.  That is, if a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable.")).[63]

---

[62]   Earlier cases in this Circuit have explained this concept as follows: "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right.  *Thompson*, 245 F.3d at 457 (citations omitted) (emphasis in original).  "Thus, an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry" in the context of a Fourth Amendment claim.  *See Cozzo v. Tangipahoa Parish Council—President Gov't,* 279 F.3d 273, 284 (5th Cir. 2002).

[63]   The *Williams* case addressed Fourth Amendment violations (unreasonable strip searches of patrons in a bar).  The concept that the "clearly established" aspect of the qualified immunity test and the "objectively reasonable" feature are two sides of the same coin has not been expressly adopted or addressed by any other panel of the Fifth Circuit.  Nevertheless, the concept makes sense and is suggested by the Supreme Court in *Hope*.  *See* 536 U.S. at 739.

"At the summary judgment stage of a § 1983 action, a defendant asserting qualified immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses." *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003). "The moving party [officer defendant] is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity." *Id.* (citing *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000)). "Once the [movant] asserts this affirmative defense, the burden shifts to the plaintiff to rebut it." *Id.* (citing *Beck*, 204 F.3d at 633-34) (internal quotation marks omitted) (emphasis in original). Thus, a plaintiff bears the burden of negating qualified immunity. *See Bazan*, 246 F.3d at 489–90.

### (b)   Agent Comeaux

Agent Comeaux argues that he is entitled to qualified immunity on Plaintiffs' Fourth Amendment *Bivens* claim. The Court first must determine whether Plaintiffs have shown they suffered a violation of a constitutional right under the Fourth Amendment. Plaintiffs contend that Agent Comeaux lacked reasonable suspicion of a crime to justify the investigatory stop and further complain that the "decision to make the stop was based on a 'hunch' and not on particularized facts; he inferred that two vehicles were involved in a drug transaction because they met in a well-lit K-Mart parking lot, in which at some time in the past some narcotics transactions had taken place, and which was in the same general

neighborhood as a crack house."[64]  Plaintiffs do not address the uncontradicted summary judgment evidence presented by Agent Comeaux.  That evidence reveals that, prior to requesting the traffic stop on July 26, Agent Comeaux knew or had observed the following: (1) the parking lot in which Plaintiffs were parked at 9:30 p.m. was a known location for illegal narcotics transactions; (2) Agent Comeaux (in an undercover capacity) recently had made three purchases of cocaine in that parking lot and had been approached by another individual who was seeking to purchase cocaine; (3) Plaintiffs parked their car (the Tahoe) in a remote area of the parking lot; (4) the driver of the Tahoe was talking on a cellular phone; (5) a Lexus appeared in the parking lot, parked very close to the Tahoe, an occupant from the Lexus walked to the Tahoe for brief meeting, and then left; (6) the driver of the Tahoe inexplicably re-parked the vehicle a few parking spaces away after the Lexus left; (7) shortly thereafter, occupants of the Tahoe participated in a similar meeting with an individual from a second vehicle; and (8) the Tahoe left the parking lot with the second vehicle.  Agent Comeaux did not see children or know any were present in the Tahoe or the other vehicles.

To assess if Plaintiffs have established the first prong of the qualified immunity test, *i.e.*, that Agent Comeaux violated their Fourth Amendment rights in contravention of *Terry*, the Court must consider the evidence and allegations in the light most favorable to Plaintiffs. As noted above, under *Terry*, investigative stops or detentions are justifiable under the Fourth Amendment if there is a reasonable, individualized, and articulable suspicion that a person

---

[64]     Response, at 30.

has committed or is about to commit a crime.  *See, e.g., Terry*, 392 U.S. at 21; *Chavez,* 281 F.3d at 485.  The Court concludes as a matter of law that Plaintiffs' allegations and the uncontradicted evidence of record do not establish (or even raise a fact issue) that Agent Comeaux violated Plaintiffs' Fourth Amendment rights.  Agent Comeaux had extensive narcotics law enforcement experience.[65]  The information he possessed created a reasonable suspicion that Plaintiffs were engaged in one or more drug transactions in the K-Mart parking lot on July 26.  Courts "traditionally give due deference to the experience of officers . . . in identifying a number of factors that, although insufficient by themselves to suggest illegal activity, taken together are indicia of certain types of illicit acts." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).  Agent Comeaux has articulated specific conduct by the occupants of Plaintiffs' vehicle that he perceived to be potentially suspicious when considered in the context of the time of day (night-time) and location (a favored place for narcotics sales).  Although individual acts by Plaintiffs, if viewed from Plaintiffs' perspective or viewed in isolation, might have innocent explanations, Agent Comeaux had a sufficient basis, as a matter of law, to constitute reasonable suspicion to justify further investigation through a stop of Plaintiffs' vehicle. *See United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992) ("Factors that ordinarily constitute innocent behavior may provide a composite

---

[65]     Agent Comeaux has worked for the DEA since 1997.  He spent six years before that as a police officer, of which four years were engaged full-time in narcotics investigations. Comeaux Affidavit, ¶ 1.

picture sufficient to raise reasonable suspicion in the minds of experienced officers. . . .").[66]

While ultimately Agent Comeaux's suspicions turned out to be incorrect, that fact alone does

not mean he committed a Fourth Amendment violation under *Terry*. *See Wardlow*, 528 U.S.

at 126. Reasonable suspicion "does not deal with hard certainties, but with probabilities."

A court must consider the information the officer had, "not in terms of library analysis by

scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449

U.S. at 412, 418 (1981). Agent Comeaux had much more than a mere "hunch" to act on.

*See Goodson*, 202 F.3d at 736. Plaintiffs have neither alleged facts nor otherwise produced

evidence to contradict Agent Comeaux's articulated facts that establish reasonable suspicion

to justify ordering the stop of Plaintiffs' vehicle for further investigation of criminal narcotics

activity.

    Even if Plaintiffs could be said to have met their burden on the first prong of the

qualified immunity test as to Agent Comeaux, Plaintiffs clearly fail on the second prong.

Plaintiffs have not shown that Agent Comeaux's actions violated "clearly established

---

[66]    *See also United States v. Wardlow*, 528 U.S. 119, 124–25 (2000) (officer had reasonable suspicion to investigate suspect who exhibited suspicious behavior in a high crime area even though the suspect's conduct was susceptible to an innocent explanation); *United States v. Burnett*, 240 F. Supp. 2d 1183, 1192 (D. Kan. 2002) (finding officer had reasonable suspicion that suspect was engaged in illegal conduct under the totality of the circumstances where suspect made a brief stop at a hotel that the officer believed was a frequent location for drug trafficking and the officer observed an individual walking away from the vehicle); *United States v. Fiascoronaro*, 2001 WL 1502574, at *10 (D. Me. Nov. 26, 2001) (finding officer had reasonable suspicion of a drug transaction; totality of circumstances included suspect sitting in a Nissan using a cell phone, the subsequent arrival of a Honda, the suspect's brief visit to the back seat of the Honda, the immediate departure of both vehicles in tandem, and the Nissan's quick reversal of direction).

statutory or constitutional rights of which a reasonable person would have known." *See Williams*, 352 F.3d at 1002 (quotation omitted).  As noted, the matters of which Agent Comeaux was aware—in the aggregate—constituted specific, articulable facts on which to base a reasonable suspicion that Plaintiffs were engaged in criminal narcotics transactions. Plaintiffs have not raised a fact issue that Agent Comeaux's conduct was objectively unreasonable.  Accordingly, Agent Comeaux is entitled to qualified immunity on Plaintiffs' Fourth Amendment *Bivens* claim as a matter of law.

(c)     <b>Agent Collins</b>

Agent Collins moves for summary judgment on Plaintiffs' Fourth Amendment *Bivens* claim on the basis of qualified immunity.  Plaintiffs do not make specific allegations concerning wrongdoing by Agent Collins.  Presumably, they challenge his involvement as a supervisor or superior of Agent Comeaux in the decision to stop their vehicle after it left the K-Mart parking lot.  Agent Collins was present with Agent Comeaux on the night of July 26.  Agent Collins thus participated at least to some degree in the surveillance and investigation.  Because the *Terry* stop was justified under a totality of the circumstances, however, Plaintiffs have not shown there was any Fourth Amendment violation based on the stop of their vehicle.  Accordingly, Agent Collins is entitled to qualified immunity for the same reasons as Agent Comeaux.[67]

---

[67]     Agent Collins argues that he had no personal involvement in the decision to order the traffic stop.  He correctly states that there can be no *Bivens* liability under a *respondeat superior* theory.  *See Abate*, 993 F.2d at 110.  Plaintiffs must establish that Agent Collins either
(continued...)

(d)     **Officer Condon**

Plaintiffs assert Officer Condon violated their rights under the Fourth Amendment to be free from unlawful detentions and arrests.  Specifically, Plaintiffs assert Officer Condon violated their rights by executing a traffic stop without reasonable suspicion and that his use thereafter of "felony stop" tactics was unreasonable.  Officer Condon argues that he is entitled to qualified immunity on Plaintiffs' Fourth Amendment § 1983 claims.  The Court agrees.

***Initial Stop.***— Officer Condon contends, first, that there was no constitutional violation because he had a reasonable suspicion to stop Plaintiffs based on the collective knowledge of Agent Comeaux and, alternatively, because he personally witnessed Plaintiffs' Tahoe illegally speeding and making lane changes without signaling.  As a matter of law,

---

[67]     (...continued)
personally participated in the unconstitutional action or enacted "a policy so deficient that the policy itself acts as a deprivation of constitutional rights."  *See Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998); *see also Guerrero-Aguilar v. Ruano*, 118 Fed. Appx. 832, 833 (5th Cir. 2004) ("*Bivens* provides a cause of action against federal agents only in their individual capacities and requires a showing of personal involvement.").  The evidence is uncontradicted that it was Agent Comeaux who made the decision to stop Plaintiffs' car and personally requested the HPD officers to do so.

Plaintiffs merely respond in conclusory fashion that Agent "Collins, as supervising agent, authorized the Alfreds' vehicle to be stopped."  *See* Response, at 35.  Other than the potential circumstantial evidence that Agent Collins outranked Agent Comeaux and was in the vehicle when Agent Comeaux requested the traffic stop, there is no proof that Agent Collins was personally involved in the decision to investigate Plaintiffs.  There is no proof whatsoever that Agent Collins implemented a policy that deprived Plaintiffs of a constitutional right.  The Court nevertheless does not rest its decision to grant summary judgment in favor of Agent Collins on his lack of personal involvement.  *See Estep v. Dallas County, Texas*, 310 F.3d 353, 361 (5th Cir. 2002).

Officer Condon's initial stop of Plaintiffs' vehicle did not violate the Fourth Amendment. In addition, Plaintiffs have not raised a genuine fact issue that Officer Condon's actions were objectively unreasonable.

Under the "collective knowledge" doctrine, Officer Condon is constitutionally permitted to rely on the knowledge of Agent Comeaux to justify the stop of Plaintiffs' vehicle at Agent Comeaux's request. *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).[68]   The Court has already determined that Agent Comeaux reasonably suspected that Plaintiffs were engaged in illicit narcotics transactions. Officer Condon's stop based on Agent Comeaux's directive was therefore supported by reasonable suspicion under the collective knowledge doctrine. *See id*.

Independent of the foregoing, Officer Condon's conduct was justified by probable cause. The evidence is uncontradicted that Officer Condon personally observed Plaintiffs'

---

[68]   In *Ibarra-Sanchez*, the Fifth Circuit upheld a local police officer's traffic stop which was based on a DEA arrest bulletin, citing the "collective knowledge" doctrine. The court held that, based on various factual observations, DEA Agent Mattas had reasonable suspicion to believe the occupants of a beige van were engaged in illegal drug trafficking. *Id.* at 758–59. Agent Mattas contacted local police and requested they stop the van. In the arrest bulletin, the police dispatcher radioed the van's description with instructions to stop the van to investigate possible illegal drugs or weapons trafficking. Several uniformed officers heard the bulletin and cooperated in executing the stop. After doing so, the officers smelled marijuana, searched the vehicle, discovered 344 pounds of marijuana, and arrested the occupants. *Id.* at 757. The Fifth Circuit affirmed the district court's denial of the occupant's motion to suppress, concluding that the officers had a reasonable suspicion based on the collective knowledge of Agent Mattas' observations. The officers, relying on the dispatcher's bulletin, were not required to have personal knowledge of the evidence that created Mattas' reasonable suspicion." *Id.* at 759 (citing *United States v. Hensley*, 469 U.S. 221, 230 (1985)). The Fifth Circuit reasoned that, if Agent Mattas had appropriate reasonable suspicion to stop the vehicle when he contacted the dispatcher, then the officers' conduct also was supported by that reasonable suspicion. *Id.*

Tahoe commit several traffic law violations by changing lanes several times without signaling and by traveling at a speed greater than the flow of traffic.[69]  Officer Condon thus had probable cause to believe that at least two provisions of the Texas Transportation Code had been violated.  *See* TEX. TRANSP. CODE ANN. §§ 545.104(a) (Vernon 1999) ("An operator shall use the signal . . . to indicate an intention to . . . change lanes . . . ."); 545.351(a) ("An operator may not drive at a speed greater than is reasonable and prudent under the circumstances").  Accordingly, even if Agent Comeaux did not have a reasonable suspicion justifying the traffic stop, Officer Condon's decision to stop Plaintiffs based on traffic violations he witnessed was reasonable.  *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Escalante*, 239 F.3d 678, 680–81 (5th Cir. 2001) (Where police officer had probable cause to believe that traffic violation had occurred based on his observation of car crossing divider line at least twice, traffic stop did not violate Fourth Amendment even though the stop may have been pretextual to investigate drug smuggling).  Plaintiffs thus fail to meet their burden on the first prong of the qualified immunity analysis, that Officer Condon's stop of their vehicle violated their constitutional rights.  Officer Condon is entitled to summary judgment on his qualified immunity defense as to the initial stop of Plaintiffs' vehicle.  Moreover,

---

[69]     Officer Condon testified that the Tahoe was traveling 70 miles per hour on a road that he believed had a speed limit of 55 miles per hour.  Condon Depo., Exhibit E to Officer Condon's Motion, at 8.

Plaintiffs have not shown a genuine fact issue that Officer Condon acted objectively unreasonably in his decision to stop Plaintiffs' vehicle.

**_Felony Stop._**— Plaintiffs assert that a "felony stop," *i.e.*, a vehicle stop during which officers draw their weapons, order the occupants out of the vehicle, handcuff them, and place them in the back of police cars, *see Ibarra-Sanchez*, 199 F.3d at 757, constitutes an arrest and therefore more rigorous constitutional safeguards are necessary.[70]  Plaintiffs rely on *Garcia v. State*, 967 S.W.2d 902 (Tex. App.—Austin 1998, no pet.).  This reliance is misplaced.  The officer in *Garcia* ordered a felony stop and utilized procedures similar to those used on Plaintiffs, that is, the officers drew their weapons, used a loudspeaker to order the passengers to exit the vehicle, and handcuffed the passengers as they exited a vehicle with heavy window tinting.  *See id.* at 904.  The suspects argued unsuccessfully that the felony stop was an arrest rather than an investigative stop and required probable cause.  *Id.* The court of appeals held that the encounter was an investigative stop, which only required a showing of reasonable suspicion, rather than an arrest under the circumstances because the occupants were suspected of an armed robbery and they acted suspiciously by not emerging from the vehicle for several minutes after being ordered to do so by police.  The court stated that officer safety justified handcuffing the suspects to limit hand movements during the investigation.  *Id.* at 905.  The benefit of *Garcia* to Plaintiffs' is not apparent.

---

[70]     Response, at 43.

Turning to an analysis of Officer Condon's qualified immunity defense in connection with the "felony stop" procedures here challenged, the Court notes that restraining a suspect by itself does not automatically convert a *Terry* stop into an arrest requiring probable cause. *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000) (citing *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir.1993)).  "The relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *Id*.  Police may take reasonable actions to protect themselves after a lawful stop of a motor vehicle.  The Fifth Circuit has observed that there is a fine line between a valid *Terry* stop and an arrest requiring probable cause.  *See Ibarra-Sanchez*, 199 F.3d at 761 (*comparing United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (finding that the defendant had been "arrested or seized" when "the first words spoken by the police officer who had his gun drawn was a command for Roch to get face down on the ground and then, without further inquiry, Roch was handcuffed") *with Sanders*, 994 F.2d at 207 ("[I]n and of itself, the mere act of drawing or pointing a weapon during an investigatory detention does not cause it to exceed the permissible bounds of a *Terry* stop or to become a de facto arrest.") *and United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) ("[D]rawn guns and handcuffs do not necessarily convert a detention into an arrest.").  The Court need not address whether the show of force in the felony stop of Plaintiffs constituted an illegal arrest.  Instead of such a "fine line" analysis, the Court only considers the second prong of the qualified immunity analysis—whether Officer Condon was objectively unreasonable in ordering the use of the

felony stop procedures.  For the reasons discussed below, the Court finds Officer Condon did not act objectively unreasonably in ordering a felony stop.

It is undisputed that Agent Comeaux, in ordering the investigatory stop, informed Officer Condon that the occupants of the Tahoe were suspected of selling crack cocaine.[71] Officer Condon states that he ordered the felony stop based on that information and other circumstances.  First, he explained that drug dealers often carry weapons to protect the illegal drugs,[72] a conclusion consistent with the Fifth Circuit jurisprudence that guns are "tools of the trade" in the illegal narcotics business.  "Weapons and violence are frequently associated with drug transactions."  *United States v. Coleman*, 969 F.2d 126, 131 n.20 (5th Cir. 1992); *see also United States v. Washington*, 340 F.3d 222, 227 (5th Cir. 2003) ("[F]irearms are tools of the trade of those engaged in illegal drug activities.").  Second, through Plaintiffs' vehicle's tinted windows, Officer Condon could see four or five people in the Tahoe, but could not discern their ages.  Officer Condon and his partner, Officer Williams, were the only two officers on the scene when he initiated the stop.[73]  "Rarely are concerns for officer safety more paramount than during the stop of a vehicle suspected of transporting drugs," *Ibarra-Sanchez*, 199 F.3d at 759.  Finally, Officer Condon stated that HPD policy requires

---

[71]     Condon Affidavit, at 2.

[72]     *Id.*, at 6.

[73]     *Id.*, at 2.  Other law enforcement officers did not arrive until later.  *Id.*

officers to conduct a felony stop when suspects are thought to possess illegal drugs.[74] Plaintiffs present no contradictory evidence.  Thus, the Court concludes as a matter of law that Officer Condon's decision to employ "felony stop" tactics under the totality of the circumstances was objectively reasonable to protect the officers' safety.  Plaintiffs have not demonstrated any genuine fact issue that Officer Condon's conduct was objectively unreasonable.  Plaintiffs have not met their burden to defeat Officer Condon's defense of qualified immunity, and their Fourth Amendment claim against him must be dismissed.

### (e)      Conclusion on Fourth Amendment Claims

This episode was no doubt frightening and upsetting to Plaintiffs and their children. However, given the uncontradicted evidence as to the circumstances surrounding the stop— particularly the need to avoid second-guessing of experienced law enforcement officers and the legitimate safety concerns involved in apprehending potentially dangerous drug dealers—Plaintiffs have failed to show a violation of their Fourth Amendment rights by Agent Comeaux, Agent Collins, or Officer Condon.  Moreover, Plaintiffs have not met their summary judgment burden to raise a genuine fact issue that any of these law enforcement officers acted objectively unreasonably in ordering the initial stop of Plaintiffs' vehicle or utilizing felony stop tactics.  All Individual Defendants are therefore entitled to qualified immunity on Plaintiffs' unlawful seizure and detention claims against the Individual

---

[74]      *Id.*, at 6.

Defendants.  The Court turns to Plaintiffs' conspiracy claim against Agent Comeaux asserted pursuant to 42 U.S.C. § 1985(3).

## IV.    § 1985 CONSPIRACY CLAIM

Plaintiffs allege Agent Comeaux and other "unknown officers" conspired to violate their rights under the Fourth, Fifth, and Fourteenth Amendments.[75]  Plaintiffs bring a conspiracy claim against Agent Comeaux under § 1985(3).  Plaintiffs argue in their Response that Plaintiffs' race, African-American, motivated the traffic stop, investigation, intimidation, threats, and actions in which "known criminals were released and directed toward their home."[76]  The parties agree that racial animus is a required element of Plaintiffs' conspiracy claim.[77]  Plaintiffs also allege Agent Comeaux "shadowed" Mr. Alfred on two occasions at the school Plaintiffs' son and Agent Comeaux's son both attended; spread rumors at Mrs. Alfred's place of employment that Plaintiffs were drug dealers; and phoned the officers investigating the invasion of Plaintiffs' home the morning of the incident to discuss the facts of the case and to encourage the officers to search the home for drugs.

These theories have various legal deficiencies.  First of all, Plaintiffs' Third Amended Complaint (and all prior pleadings) do not support the broad allegations in Plaintiffs' Response.  Plaintiffs in their pleadings allege that Agent Comeaux engaged in a conspiracy with other agents "after September 2001."  This allegation excludes any of the July or

---

[75]     Response, at 53.

[76]     *Id.*

[77]     *See* Response, at 51, 57; DEA Defendants' Motion, at 18.

September 2001 events.  Thus, to the extent Plaintiffs seek through their Response to Defendants' Motions to expand the claims against Agent Comeaux to cover events in July and September 2001, the request is untimely and is denied.  Leave to amend after the deadlines granted in the Court's scheduling order is guided by Rule 16 of the Federal Rules of Civil Procedure.  The Court of Appeals has set forth the governing standard:  "Federal Rule of Civil Procedure 16(b) governs amendment of pleadings once a scheduling order has been issued by the district court.  Rule 16(b) provides that a scheduling order 'shall not be modified except upon a showing of good cause and by leave of the district judge.'  The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'"  *Southwestern Bell Telephone Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003) (citing *S & W Enters., LLC v. Southtrust Bank of Ala., NA,* 315 F.3d 533, 535 (5th Cir. 2003) (quoting 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1522.1 (2d ed. 1990))).  The Fifth Circuit added:  "In determining good cause, we consider four factors: '(1) the explanation for the failure to timely move for leave to amend;  (2) the importance of the amendment;  (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.'"  *Id.* at 546 (citing *S & W Enters.*, 315 F.3d at 535).  The court-imposed deadline for amending pleadings was June 30, 2004.  Plaintiffs have made none of the required showings under *Southwestern Bell*.  It is far too late to amend pleading to expand pending claims.  Nevertheless, in the interest of justice, the Court will

consider the conspiracy claim viewed in its broadest light as Plaintiffs seek to characterize it.

Agent Comeaux seeks summary judgment on Plaintiffs' § 1985(3) conspiracy claim on the ground there is no evidence that he had any racial animus against African-Americans. Agent Comeaux also argues Plaintiffs have adduced no credible evidence that he was involved in any conspiracy whatsoever.

A person injured as the result of a conspiracy to interfere with her civil rights may bring an action under 42 U.S.C. § 1985. Section 1985(3) provides a remedy to "any person or class of persons" harmed when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." In order to prevail on a claim under § 1985(3) in the Fifth Circuit, a plaintiff must establish the following elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus. *See Brotherhood of Carpenters and Joiners of Am., Local 610 v. Scott*,

463 U.S. 825, 828–29 (1983); *Griffin v. Breckenridge*, 403 U.S. 88, 102-103 (1971); *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 n.12 (5th Cir. 2001).[78]

As evidence of racial animus, Plaintiffs contend race motivated the initial traffic stop and, after the stop, "race, Lee Brown and Niggers became the topic of discussion."[79]   The Court is unpersuaded.  There is no evidence that Agent Comeaux, an African-American, harbored any racial animus towards Plaintiffs.  As discussed above, Agent Comeaux had reasonable suspicion to order the investigatory stop.  There is no evidence he ordered the stop because of Plaintiffs' race.  Further, there is no evidence Agent Comeaux made or had any connection with the alleged racial slurs in the record.  Agent Comeaux was not even present when an unidentified officer allegedly referred to Mr. Alfred as a "nigger."  The absence of any evidence of racial animus attributable to Agent Comeaux defeats Plaintiffs' § 1985(3) conspiracy theory.[80]   *See Griffin*, 403 U.S. at 101; *Horaist*, 255 F.3d at 270 n.12.

---

[78]   In *Brotherhood of Carpenters*, a First Amendment case, the Supreme Court held that the state must be involved in the conspiracy or the aim of the conspiracy must be to influence the activity of the state.  463 U.S. at 833.  It is unclear whether this requirement applies in a *Bivens*-type claim.  The parties do not argue this point, and the Court does not reach this issue.

[79]   Response, at 52.

[80]   Mr. Alfred testified in his deposition that he believed that Agent Comeaux was motivated by retaliation against Plaintiffs, separate from any alleged racial animus.  Although the details are unclear from the record, Plaintiffs apparently complained to the media and the DEA about the traffic stop.  Plaintiffs cite no language in § 1985(3) or authority construing the statute to support a retaliation claim.  Nor do Plaintiffs allege any civil rights retaliation claim against Comeaux.  Therefore, the Court does not reach the question of whether § 1985(3) supports a retaliation claim.

Accordingly, summary judgment is appropriate on Plaintiffs' conspiracy claim against Agent Comeaux.[81]

## III.   ATTORNEYS' FEES COUNTERCLAIM OF OFFICER CONDON

Also pending in this case is Officer Condon's counterclaim against Plaintiffs for attorney's fees he incurred defending this lawsuit.  This counterclaim is brought pursuant to § 1988.  Officer Condon contends he is entitled to recoup these fees because Plaintiffs' "claims against him have been brought in bad faith, with the Plaintiffs having knowledge that [Officer Condon] committed no wrong."[82]  It is within the purview of the district court to grant or deny attorney's fees under § 1988.  42 U.S.C. § 1988(b) (" the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . ."); *see generally Ustrak v. Fairman*, 851 F.2d 983, 989-90 (7th Cir. 1988) (no infringement of right to jury trial for court of appeals to modify district court's rulings on award of attorneys' fee).  Officer Condon has not sought summary judgment dismissing this counterclaim.  The Court nonetheless addresses this issue *sua sponte* in the interest of judicial economy on the basis of the extensive record presented by the parties and the rulings set forth herein.  Plaintiffs may seek reconsideration of the matter within ten days of entry of this Memorandum and Order, if Plaintiffs have evidence and legal

---

[81]   The Court does not reach Agent Comeaux's alternative summary judgment argument that there is no evidence of any conspiracy or acts taken in furtherance of a conspiracy.

[82]   Defendant Officer M. Patrick Condon's Answer and Response to Plaintiffs' Third Amended Complaint and Defendant M. Patrick Condon's Counterclaim [Doc. # 68], ¶ 109.

authorities that they believe, within the requirements of Federal Rule of Civil Procedure 11, would alter the Court's findings and conclusions.

For the reasons set forth below, the Court dismisses Officer Condon's counterclaim. Under § 1988, a district court may award attorney's fees to a prevailing party in a § 1983 suit. *See United States v. Mississippi*, 921 F.2d 604, 609 (5th Cir. 1991). Pursuant to § 1988, a court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" for proceedings in vindication of civil rights. The purpose of this law is to ensure "effective access to the judicial process for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). An award of § 1988 attorney's fees is reviewed under the abuse of discretion standard. *Walker v. City of Bogalusa*, 168 F.3d 237, 239 (5th Cir. 1999).

A prevailing plaintiff under § 1988 is entitled to attorney's fees unless "special circumstances would render an award unjust." *United States v. Mississippi*, 921 F.2d at 609 (citing *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402 (1968)). However, "[a] successful defendant seeking counsel fees . . . must rely on quite different equitable considerations." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 419 (1978).

A prevailing defendant is entitled to recover attorney's fees under § 1988 only if the court finds that "the plaintiff's action was frivolous, unreasonable, or without foundation." *Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001) (quoting *Christianburg Garment Co.*, 434

U.S. at 421 (1978)).[83]  Such fee awards "are presumptively unavailable unless a showing is made that the underlying civil rights suit was vexatious, frivolous, or otherwise without merit." *Dean*, 240 F.3d at 508.  "A suit is frivolous if it 'so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful.'"  *Walker*, 168 F.3d at 240 (quoting *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1140 (5th Cir. 1983)).  The stringent standard applicable to defendants "is intended to ensure that plaintiffs with uncertain but arguably meritorious claims are not altogether deterred from initiating litigation by the threat of incurring onerous legal fees should their claims fail." *Myers v. City of West Monroe*, 211 F.2d 239, 292 n.1 (5th Cir. 2000) (citation omitted).

Plaintiffs are entitled to summary judgment dismissing Officer Condon's claim for attorney's fees under § 1988.  Officer Condon cannot show on the available record that all Plaintiffs' claims against him were frivolous, vexatious or without merit to the necessary degree.  Officer Condon detained Plaintiffs based on both traffic violations he personally observed and on what turned out to be erroneous inferences drawn by DEA Agents in a narcotics investigation.  However, it does not appear Plaintiffs were informed about the traffic violations as a basis for the stop and they received no citations or warnings from Officer Condon on their driving conduct.  Further, because multiple law enforcement officials from three different entities were involved in the traffic stop and Plaintiffs had no way of knowing what the DEA Agents' claimed factual basis was for the stop.  Evidence

---

[83]     This limitation attempts to prevent any chilling effect on the enforcement of civil rights.  *See Vaughner v. Pulito*, 804 F.2d 873, 878 (5th Cir. 1986).

available through the discovery process was necessary to flesh out the basis for the stop and whether any of the officials violated Plaintiffs' constitutional rights.   Although Officer Condon successfully defended against Plaintiffs' claims,   Plaintiffs' claims were not frivolous, vexatious or otherwise entirely without merit.  Officer Condon's counterclaim for attorney's fees is dismissed.

## IV.   <u>CONCLUSION AND ORDER</u>

For the reasons discussed above, the Individual Defendants are entitled to summary judgment dismissing each claim in Plaintiffs' Third Amended Complaint.  Dismissal is warranted on Plaintiffs' state law claims against the United States.  Officer Condon's counterclaim for attorney's fees is dismissed.  Accordingly, it is hereby

**ORDERED** that the Motion for Summary Judgment filed by Defendant M. Patrick Condon [Doc. # 109] is **GRANTED**.  It is further

**ORDERED** that the Motion for Summary Judgment filed by Defendants Daniel Comeaux and Edmund Collins [Doc. # 110] is **GRANTED**.  It is further

**ORDERED** that the Motion to Dismiss State Law Claims [Doc. # 113] filed by Defendant United States of America is **GRANTED**.

**ORDERED** that the Defendant M. Patrick Condon's Counterclaim [Doc. # 68] against Plaintiffs is **DISMISSED with prejudice.**

The Court will enter a separate final judgment.

SIGNED at Houston, Texas, this **28th** day of **February 2006**.

_____
Nancy F. Atlas
United States District Judge